UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NYDIA DIAZ,

                                   Plaintiff,

        v.                                              1:06-cv-0222

ITW FOOD EQUIPMENT GROUP LLC,

                                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiff Nydia Diaz commenced the instant action seeking to recover for injuries

she sustained while cleaning a meat slicing machine manufactured by Defendant (or its

predecessor).  Plaintiff asserts claims for negligence, breach of warranty, and strict liability.

Presently before the Court is Defendant's motion seeking to preclude Plaintiff's expert

witness, I. Robert Ehrlich, and for summary judgment pursuant to FED. R. CIV. P. 56 seeking

dismissal of the Complaint.

## I.    FACTS

        This case involved the Hobart Model 1712E Meat Slicer (the "slicer") manufactured

and sold in 1990.  At all times relevant hereto, the slicer was owned by the Marlboro High

School.

        The slicer complies with the Underwriters Laboratories 763 Standard for Safety for

Motor-Operated Commercial Food Preparing Machines and National Sanitation Foundation

Standard 8 - 1985, Commercial Powered Food Preparation Equipment.  The slicer contains

an on/off switch that is activated by pulling the knob out to turn the slicer on, and pushing the

knob in to turn the slicer off.  The slicer has a warning label that reads:

WARNING
ROTATING KNIFE
USE FEED GRIP

_____
UNPLUG CORD BEFORE CLEANING,
SERVICING OR REMOVING PARTS
_____
REPLACE PARTS BEFORE USE

The manual for the slicer reads, in part, as follows:

**SAFETY**

* * *

When the slicer is not running, the INDEX KNOB (Fig. 5) must be turned
back below zero (fully clockwise).  The gauge plate will then prevent the
knife edge from being exposed.

Always UNPLUG the power cord before cleaning or moving the slicer.

* * *

**CLEANING**

* * *

**WARNING:**  UNPLUG MACHINE POWER CORD AND TURN THE
INDEX KNOB FULLY CLOCKWISE BEFORE CLEANING THE SLICER.

Plaintiff was employed at the Marlboro High School.  At the time of her injury,

Plaintiff had approximately four and one-half years of experience using the meat slicer.  She

had never read the manual for the slicer.  When Plaintiff cleaned the slicer during the day,

she would not unplug it first.  For example, when changing meats to be sliced, Plaintiff would

wipe down the slicer, but would not unplug it.  At the end of each day when Plaintiff would

clean the slicer for the next day, she would unplug it prior to cleaning.

On April 30, 2004, Plaintiff was wearing jeans, a sweater, and a sleeveless cobbler

apron with two front pockets and four snaps down the front.  At approximately 10:20 or 10:30

a.m., Plaintiff had completed slicing roast beef on the slicer.  Plaintiff then proceeded to wipe down the slicer so she could slice turkey.  Plaintiff did not unplug the slicer.

At her deposition, Plaintiff testified that, prior to wiping down the slicer, she removed the carriage that exposes the blade.[1]  Plaintiff then turned the index knob, which exposed the slicer's blade, to get under the bottom with a towel.  According to Plaintiff, her apron became caught on the on/off knob, the slicer started, and her left hand was injured.

Plaintiff testified at deposition that, the warning label was visible and that, although the warning label was right above the knob, she "just never looked at it."  At deposition, Plaintiff was asked the following question and gave the following answer:

> Q:      And if you looked at the warning label and it said, "unplug cord before cleaning," you certainly would have done that, correct?
>
> A:      Yes, I would certainly have done it, yes.[2]

---

[1] In her responsive statement of material facts, Plaintiff disputes this claiming "Plaintiff, who was in shock after the accident, is unable to admit or deny this statement and may be confused as to the precise procedure she followed."  Pl.'s Responsive Statement of Material Facts ("RSMF") at ¶ 11.  This assertion by Plaintiff is unsupported by any citation to the record and is contrary to the affidavit submitted by Plaintiff's counsel which states "[a]t the time of the accident, plaintiff had removed the cartridge and was wiping the slicer including the area underneath."  Polimeni aff. at p. 5.  Emma Davis, a coworker, testified at deposition that the carriage was still on the slicer.  Davis certainly would be qualified to testify whether she observed that the cartridge had been removed.  This factual dispute is irrelevant to the pending motions.

[2] In her RSMF, Plaintiff responds that her testimony in this regard was with the benefit of hindsight after she sustained an injury to her hand.  She further claims that, at the time of the accident, she and her co-workers distinguished between the final cleaning at the end of the day (at which time she would unplug the slicer) and cleaning during the day while switching meats, at which times workers frequently did not unplug the cord.  Plaintiff's claims in this regard are unsupported by the citation to her deposition testimony at pp. 19-21.  It is, however, somewhat supported by the deposition testimony of Emma Davis who stated that ". . . you shouldn't have to unplug it just to wipe it down.  If you are not doing a full cleaning.  A full cleaning is taking everything apart, this is part of the guard, and going into the nooks and crannies trying to get the meat out."  This factual dispute is irrelevant to the pending motions.

## II.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56( c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

III.    **DISCUSSION**

a.    **Preclusion of Expert Testimony**

Defendant moves to preclude the opinion of Plaintiff's proposed expert, I. Robert Ehrlich, on the grounds that he is not qualified to render an opinion with respect to commercial food preparation equipment, that his opinions are unsubstantiated and speculative, and that his proposed alternative designs are untested concepts.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  That rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Civ. P. 702.  In its gatekeeping function under Rule 702, this Court must ensure that a proposed expert's testimony rests on a reliable foundation and is relevant to the task at hand.  Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).  In determining the reliability of the proffered testimony, the Court must consider: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.  Id.

> In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those

facts, and how the expert applies the facts and methods to the case at hand.  A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible.  The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.

Id. (internal quotations and citations omitted).

The district court's inquiry into the reliability of expert testimony is flexible. See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).  The trial judge has great latitude not only in deciding whether an expert's testimony is reliable, but in deciding how to make that inquiry. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999).  However, "the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered," and "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993)] and Rule 702 mandate the exclusion of that unreliable opinion testimony."  Amorgianos, 303 F.3d at 265-66 (internal quotation marks omitted).

Olin Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d 120, 133 (2d Cir. 2006).

## 1.    **Expert Testimony Regarding Warnings**

Defendant argues that Plaintiff's proposed expert, I. Robert Ehrlich, is not qualified to render opinions regarding the warnings on the slicer and that his opinions are otherwise unreliable.  It will be recalled that the slicer had a warning that read: "UNPLUG CORD BEFORE CLEANING, SERVICING OR REMOVING PARTS."  With respect to this warning, Ehrlich opines that:

While the machine contained a warning for the operator to unplug the cord before performing any maintenance or cleaning, this warning was defective, because it was not clear that the word "cleaning" was intended to include the operation being performed by Diaz, that is, wiping down the machine.

The Court finds that Ehrlich is not qualified to testify regarding product warnings and that his opinion is otherwise unreliable.  The reasons for these conclusions are as follows.  First, nothing about Ehrlich's credentials (including his training or experience) suggests that he is qualified to testify regarding the efficaciousness, design, or placement of warnings or labels.  See McCullock v. H.B. Fuller Co., 981 F.2d 656, 657 (2d Cir. 1992). Rather, his credentials and experience is in product design and mechanical engineering. Second, Ehrlich admittedly has no experience with commercial food equipment, industry standards applicable to commercial food equipment, or the design or manufacture of commercial food equipment.  Third, Ehrlich failed to set forth the basis for his conclusion that the word "cleaning" was not clearly intended to include "wiping" the machine down.  Although there is some testimony in the record that kitchen workers at the Marlboro school differentiated between a thorough cleaning at the end of the day (at which time they unplugged the slicer) and less thorough cleanings throughout the day (at which times they would sometimes unplug the machine, but other times they would not), Ehrlich never indicated that he relied on this testimony.  Fourth, expert testimony is not needed to assist the trier of fact in determining the meaning of "wipe" and "clean."  See Strong v. E.I. DuPont de Nemours Co., Inc., 667 F.2d 682, 686 (8th Cir. 1981) ("[W]hether the lack of warnings rendered the . . . products unreasonably dangerous is not the kind of issue on which expert assistance is essential for the trier of fact.").

Fifth, Ehlrich's conclusion that the term "cleaning" is ambiguous and may not include "wiping" is untenable.  Plaintiff makes much of the fact that she was not "cleaning" the slicer, but merely "wiping" it down in between cutting different types of meats.  The common definition of the word "wipe" is"to rub lightly with or on a cloth, towel, or paper, than

hand, etc., *in order to clean or dry the surface of*."  The Random House Dictionary of the

English Language at 1638 (1979) (emphasis added); see also Oxford English Dictionary (2d

ed. 1989) (online version) ("To rub (something) gently with a soft cloth or the like, or on

something, *so as to clear its surface* of dust, dirt, moisture, etc.; *to clean* or dry in this way.")

(emphasis added); Merriam-Webster Online Dictionary, http://www.m-w.com/dictionary/wipe

("1 a : to rub with or as if with something soft *for cleaning* b : *to clean* or dry by rubbing c : to

draw, pass, or move for or as if for rubbing or *cleaning*.") (emphasis added); The American

Heritage Dictionary of the English Language (4th ed. 2006)

(http://dictionary.reference.com/browse/wipe) ("To subject to light rubbing or friction, as with a

cloth or paper, *in order to clean or dry*.  *To clean* or dry by rubbing: wiped my feet before I

went inside.") (emphasis added).  Indeed, Plaintiff testified at deposition that when she was

wiping the slicer, she "was cleaning the machine." Pl.'s Dep. at 47.[3]

Sixth, Plaintiff's expert opinion is directly contrary to Plaintiff's own interpretation of

the meaning of "wiping."  As noted, Plaintiff responded affirmatively to the question of

whether she was "wiping" down the machine "to clean off the roast beef" and acknowledged

that she "was cleaning the machine."  For the foregoing reasons, Ehrlich's opinions regarding

the warning on the slicer must be precluded.

## 2. Expert Testimony Regarding the On/Off Switch

---

[3] At deposition, Plaintiff was asked the following question and gave the following answer:

Q:    And you were *wiping* it down to *clean* off the roast beef before moving to the turkey?

A:    Yes.

Pl.'s Dep. at 46-47 (emphasis added).

Defendant also moves to preclude Ehrlich's opinions concerning the design of the on/off switch on the grounds that Ehrlich is not qualified and that his opinions are otherwise unreliable. Ehrlich opined that the slicer should have been designed to prevent accidental activation. In his report, Ehrlich stated:

> It is clear that the shape of the start knob could catch onto clothing and unintentionally start this machine, as it did immediately prior to Diaz' accident. It was at the right height and shape to catch onto an apron pocket, which most kitchen workers would wear. Both Diaz and Davis experienced this event.

Ehrlich then proceeds to discuss alternative designs such as "a rod without a knob," "a latch cover," "a rotary motion to initiate operation," and/or "a delay and, perhaps a warning sound, between the time of activation of the start switch and the start of the motor."

The Court has little doubt that Ehrlich is generally qualified with respect to the design of on/off switches. He has substantial experience designing on/off switches for various applications, albeit not for commercial food preparation products. For this reason, Ehrlich is qualified to testify regarding the design of such switches, the feasability of such switches generally, and alternative designs. Ehrlich's lack of knowledge concerning the use of these alternative designs in food preparation products and questions whether his alternative designs meet various industry standards or present other risks is the proper subject of cross-examination.

The Court finds, however, that Ehrlich's opinion concerning whether the on/off switch on the slicer was defective is unreliable. As noted, Ehrlich testified that the design of the on/off switch on the slicer is defective. However, he failed to articulate a basis for that conclusion. At deposition, Ehlrich stated that he never did any independent research for this case, he never operated a meat slicer for purposes of his work on this case, he did not

review any publications regarding designs for on/off switches on meat slicers, he did not

examine any exemplar slicers, and he did not examine slicers from other manufacturers.

Ehlrich Dep. at pp. 40-43.  Ehlrich further testified that he was unfamiliar with the applicable

industry standards (UL and National Sanitation Foundation).  Further, at deposition, Ehrlich

was asked the following questions and gave the following answers:

> Q:    Is it your opinion that a pull-to-start/push-to-stop for food service
>       equipment is not a proper design?
>
> A:    Yes.
>
> Q:    And what is that based on?
>
> A:    We have an accident where somebody got caught in it and
>       turned it on and got injured.
>
> Q:    Other than this one accident, do you have any evidence of other
>       people having this occur?
>
> A:    I have not made a survey of all the accidents that ever
>       happened on this meat slicer, but I know this meat slicer is
>       dangerous.  They admit its dangerous, which must mean that
>       people get injured with it. . . .
>
> * * *
>
> Q:    Do you know how many injuries there have been through what
>       you have referred to or what Ms. Diaz refers to as this
>       inadvertant start by your clothing being caught on it?
>
> A:    Only Hobart would know that, if those were reported to them.
>
> Q:    Are you aware of any other incident in which someone caught
>       their clothing on the pull-to-start button and inadvertently
>       activated it?
>
> A:    I did not make a study of that.  I do not know.

Id. at pp. 66-67.  Additional questioning of Ehrlich occurred as follows:

Q:      What I'm asking is what is the basis, given that this is the only
        incident you're aware of and that it's a standard design in the
        industry, for believing that this is a dangerous design?

A:      Ms. Diaz's hand.

Q:      Other than the fact that Ms. Diaz was hurt that day, is there any
        other basis for believing that this is not an appropriate design?

A:      I have no other information, nor have I looked for any other
        information.

Q:      Is it your opinion, with respect to any kind of equipment, if
        someone is injured, it therefore is a dangerous piece of
        equipment?

A:      Most — I had a - working for me a safety man, and he said if
        anything — anybody ever gets injured, that means it was
        dangerous.  It was improperly designed.  That was his opinion,
        and he knew a lot more about safety than I do.

Q:      And do you subscribe to that opinion that if any one person gets
        injured, it's therefore not a safe design?

A:      . . . . [O]ne time she makes a mistake and she's injured . . .
        that's a dangerous machine.

Id. at pp. 69-70.  This line of questioning reveals that the sole basis for Ehrlich's opinion that

the design of the on/off switch is defective is because Plaintiff was injured.  Ehrlich did not

base this opinion upon any studies he performed or reviewed concerning the design of on/off

switches; tests or studies concerning the likelihood that similarly designed switches can be

inadvertently activated by being caught on clothing or otherwise; or data concerning the

frequency with which such incidents occur on such a type of switch.  Ehrlich's conclusions

regarding whether the switch used on the subject slicer is defective are, therefore, unreliable

and inadmissible.

For the foregoing reasons, Defendant's motion to preclude the testimony of Dr. Ehrlich is GRANTED with respect to any testimony concerning: (1) whether the switch used on the slicer was defective; and (2) the sufficiency of the warnings on the slicer.  Dr. Ehrlich may only testify concerning alternative designs for on/off switches.

        **b.**      **Products Liability**

        **1.**      **Whether the Switch was Defective**

Defendant seeks dismissal of Plaintiff's products liability cause of action.  To prevail on her claim, Plaintiff must establish that the slicer was defective and that the defective product was the cause of the injuries she sustained.  Olsovi v. Salon DeBarney, 118 A.D.2d 839, 840 (2d Dep't 1986); see also Robinson v. Reed-Prentice Division of Package Mach. Co., 49 N.Y.2d 471, 443, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980) ("A cause of action in strict products liability lies where a manufacturer places on the market a product which has a defect that causes injury."); Gilks v. Olay Co., Inc., 30 F. Supp.2d 438, 443 (S.D.N.Y. 1998).  "To state a cause of action for a design defect, [P]laintiff[] must allege that the [slicer] was unreasonably dangerous for its intended use."  McCarthy v. Olin Corp., 119 F.3d 148, 155 (2d Cir. 1997).

> Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed.  This rule, however, is tempered by the realization that some products, for example knives, must by their very nature be dangerous in order to be functional.  Thus, a defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce. . . . Since no product may be completely accident proof, the ultimate question in determining whether an article is defectively designed involves a balancing of the likelihood of harm against the burden of taking precaution against that harm

Robinson, 49 N.Y.2d at 479.

> [T]he New York standard for determining the existence of a design defect
> has required an assessment of whether if the design defect were known
> at the time of manufacture, a reasonable person would conclude that the
> utility of the product did not outweigh the risk inherent in marketing a
> product designed in that manner. This standard demands an inquiry into
> such factors as (1) the product's utility to the public as a whole, (2) its
> utility to the individual user, (3) the likelihood that the product will cause
> injury, (4) the availability of a safer design, (5) the possibility of designing
> and manufacturing the product so that it is safer but remains functional
> and reasonably priced, (6) the degree of awareness of the product's
> potential danger that can reasonably be attributed to the injured user, and
> (7) the manufacturer's ability to spread the cost of any safety-related
> design changes.

Denny v. Ford Motor Co., 87 N.Y.2d 248, 256, 639 N.Y.S.2d 250 (1995) (internal quotations and citations omitted). This question ordinarily is for the jury to decide.

There can be little doubt that a meat slicer is, by design, dangerous. Unlike a knife, a meat slicer is inherently more dangerous because an electric motor causes the cutting blade to rotate. It is this increased dangerousness (an electric rotating blade) that provides the increased utility of the product to the public as a whole and to the individual user over, for example, a non-mechanized knife, or a human-powered rotating blade. Thus, the dangerousness of the meat slicer caused by the electrically operated rotating blade is necessary for its functionality.

In light of the inherent dangerousness of a meat slicer, there is a recognition that it could cause injury if fingers or other body parts get caught in the rotating blade. Such an injury certainly is reasonably foreseeable. The question here, however, is whether the location and type of on/off switch used on the slicer was not reasonably safe; that is, whether there was a likelihood of harm that could result from the type of on/off switch used and its placement on the slicer. See Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 108 (1983).

Although Plaintiff does not have any expert testimony regarding the safety of the on/off switch on the slicer, a juror is capable of looking at the location and design of the switch and determining whether its shape renders it not reasonably safe or is likely to catch on clothing, thereby causing inadvertent activation.  Such a conclusion would be supported by the evidence by Plaintiff and by her co-worker, Emma Davis, that there were occasions when clothing became caught on the on/off switch.

It similarly is for the jury to determine whether safer designs are available and economically feasible.  Plaintiff does have expert testimony in this regard.  Although Defendant identifies numerous problems with this expert testimony, it is for the jury to determine whether these alternative designs are feasible in light of other safety, ergonomic, sanitary, economic, and/or other concerns.

For the foregoing reasons, the Court finds that there are triable issues of fact concerning whether the on/off switch was defective.

### 2.    <u>Proximate Cause</u>

Defendant also argues that any design defect was not the proximate cause of Plaintiff's injuries.  Rather, Defendant contends that Plaintiff's failure to unplug the slicer before cleaning it was the proximate cause of her injuries.

It cannot be disputed that, if the slicer was unplugged, Plaintiff's injury would not have occurred.  Moreover, there is substantial evidence that Plaintiff's own negligent conduct, including her failure to abide by Davis' instructions that she always unplug the slicer before cleaning it, Davis Dep. at 14-15, 31, failure to read the manual's warning that the machine be unplugged before cleaning, and failure to abide by the warning label that also advised to unplug the machine before cleaning, was a substantial factor in the accident.  In

this regard, Defendant is free to argue that Plaintiff's conduct was the sole factor in the

accident.  Nevertheless, a fair-minded trier of fact could reasonably conclude that the design

of the on/off switch contributed to the accident.  It can be fairly concluded that, but for the

design of the on/off switch, Plaintiff's clothing would not have gotten caught on the switch,

thereby causing it to pull out and activate the slicer.

Accordingly, the Court finds that there are triable issues of fact with respect to

causation.

### c.    Failure to Warn

Defendant also seeks dismissal of the failure to warn claim.  Plaintiff has the

burden of demonstrating that Defendant's failure to warn was the proximate cause of her

injury.  Sosna v. Am. Home Prods., 298 A.D.2d 158 (1st Dep't 2002).  "[T]his burden includes

adducing proof that the user of a product would have read and heeded a warning had one

been given."  Id.  Here, in light of the label's clear warning that the slicer not be cleaned

without first unplugging it; the warning in the manual advising that the slicer not be cleaned

without first unplugging it; Plaintiff's deposition testimony that she did not read the manual,

she did not read the warning and that, had she looked at the label stating "unplug cord before

cleaning," she would have done so, Diaz Dep. at 73; and the lack of any other evidence,

admissible in form, concerning inadequacies in the warning (either in its conspicuousness or

its substance[4]), the failure to warn claim must be dismissed.  Id.

### d.    Warranty Claims

---

[4] For the reasons previously discussed, Plaintiff's argument that the warning was ambiguous with respect to its applicability to "wiping" is without merit.  A reasonable person would conclude, and Plaintiff did actually conclude, that cleaning includes wiping.  See discussion supra at § II(A)(1).

Lastly, Defendant moves to dismiss the breach of warranty claim. This claim must be dismissed because it is untimely. The slicer was originally delivered in 1990 and the instant action was commenced more than four years thereafter. <u>Heller v. U.S. Suzuki Motor Corp.</u>, 64 N.Y.2d 407, 410 (1985).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to preclude the testimony of Dr. Ehrlich is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as Dr. Ehrlich's testimony will be limited to alternative switch designs. Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the failure to warn and breach of warranty claims. Defendant's motion to dismiss the design defect claim is DENIED.

IT IS SO ORDERED.

Dated:August 8, 2007

Thomas J. McAvoy

Senior, U.S. District Judge